MANHATTAN STEAMBOAT COMPANY,
LLC and DORIT ZEEVI-FARRINGTON,
on behalf of themselves and all others
similarly situated,

       Plaintiffs,

v.

AMERICAN EXPRESS COMPANY,
AMERICAN EXPRESS TRAVEL RELATED
SERVICES, INC., and AMERICAN
EXPRESS BANK, F.S.B.,

       Defendants.

CIVIL ACTION NO. *13 – CV–5580*

## CLASS ACTION COMPLAINT

    Plaintiffs Manhattan Steamboat Company, LLC and Dorit Zeevi-Farrington allege as

follows on behalf of themselves and all persons and entities similarly situated within the United

States:

### PARTIES

    1.    Manhattan Steamboat Company, LLC ("Manhattan Steamboat") is a New York

limited liability company with its headquarters in New York City. Manhattan Steamboat has had

an American Express branded Blue for Business credit card since June 2004.

    2.    Dorit Zeevi-Farrington ("Ms. Zeevi-Farrington") is a citizen of the State of New

York and the President of Manhattan Steamboat. Ms. Zeevi-Farrington has provided a personal

guarantee on Manhattan Steamboat's American Express business credit card account throughout

the life of the account.

3.     The Currently Unnamed Plaintiffs are those small businesses which hold or have held in recent years American Express business credit cards, and the respective owners or individuals who are or were personal guarantors on the credit cards, that have been harmed by American Express' unilateral imposition of higher annual percentage rates in violation of the contractual agreements between American Express and its customers.

4.     Defendants American Express Company, American Express Travel Related Services Company, Inc., and American Express Bank, F.S.B. (collectively, "American Express") and their related entities constitute one of the largest credit card issuers in the country. American Express provides credit cards to millions of small businesses and small business owners, including Plaintiffs.

5.     American Express Company is a citizen of the State of New York for the purposes of 28 U.S.C. § 1332, and has its headquarters in New York City. It can be served with process via CT Corporation System, 111 8th Avenue, New York, New York 10011.

6.     American Express Travel Related Services Company, Inc. is a citizen of the State of New York for the purposes of 28 U.S.C. § 1332, and has its headquarters in New York City. It can be served with process via CT Corporation System, 111 8th Avenue, New York, New York 10011.

7.     American Express Bank, F.S.B. is a citizen of the State of Utah for the purposes of 28 U.S.C. § 1332, as its headquarters is located at 4315 South 2700 West Salt Lake City, Utah 84184. Although American Express Bank, F.S.B. has substantial operations in New York, it is not currently registered to do business in the state. As such, American Express Bank, F.S.B. can be served with process at its Utah office located at 4315 South 2700 West Salt Lake City, Utah 84184.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, there are at least 100 members of the putative Class, and at least one of the members of the proposed Class (which consists of small businesses and persons from all 50 states) is a citizen of a different state than American Express.

9.     Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391 because American Express is subject to personal jurisdiction here, regularly conducts substantial business in the Southern District, and because many of the acts or omissions giving rise to the claims asserted herein occurred and continue to occur in this district.

## FACTUAL BACKGROUND

10.     Defendants and their affiliated companies constitute a diversified financial services company offering a broad array of credit card and banking products and services to small business customers in the United States.

11.     Defendants and their affiliated companies aggressively market their credit card products to small business customers throughout the country.

12.     A substantial and profitable subset of the business credit card market is the small business market. However, unlike larger companies, small businesses are often only extended credit if a personal guarantee is signed by one or more of the individuals that own the business or are officers or employees thereof. Such personal guarantees are meant to protect lenders in the event that a business fails or otherwise becomes insolvent, by pledging the assets of the guarantor to repay any outstanding debt on the account.

13.	As part of the decision to extend or decline credit, Defendants and their affiliated companies analyze the creditworthiness of the owner or officer providing the personal guarantee. Such analysis includes inquiries into the guarantor's credit score, also known as a FICO score. In addition, business credit cards are also reported to the credit agencies and appear on the guarantor's personal credit report.

14.	The result is that small business credit cards, while opened in the name of a business, are virtually indistinguishable from consumer credit card accounts in practice. Such accounts, while opened in the name of the business, are subject to credit limits based on the guarantor's creditworthiness and are reported on the guarantor's credit history. Such cards are marketed to individual businesses and their owners and such marketing is virtually indistinguishable in form from the marketing of personal and consumer cards.

15.	Small business owners, including Ms. Zeevi-Farrington, reasonably relied on American Express to ensure that their credit card accounts were maintained in accordance with their contractual agreements and that no improper or unlawful practices would be utilized by Defendants.

16.	While credit limits, rewards programs, and nominal interest rates differ from card to card and account to account, American Express business credit cards can generally be grouped into one of two categories. The first are credit cards with a "fixed-variable" interest rate. The second are credit cards which have a "fixed" interest rate.

17.	For clarification, a fixed-variable rate is an interest rate which is tied to an index rate, such as the Prime Rate as published in the *Wall Street Journal*. A fixed-variable rate is variable in the sense that, as the index rate increases or decreases, the interest rate correspondingly increases or decreases. The rate is fixed in that there is a fixed marginal rate on

top of the index rate. Adding the index rate and the marginal rate together produces the actual interest rate charged. So, if the Prime Rate is five percent and the customer's marginal rate is 2.99 percent, then the interest charged to the customer is 7.99 percent. If the Prime Rate increases to eight percent, then the customer's interest rate increases to 10.99 percent. If the Prime Rate then decreases to four percent, the customer's interest rate decreases to 6.99 percent.

18.     The Prime Rate as published in the *Wall Street Journal* is the relevant index rate in this case because it is the rate selected by American Express and listed in its form contracts. The Prime Rate is the interest rate charged by banks to their most creditworthy customers (usually the most prominent and stable business customers). The Prime Rate is almost always the same among major banks.

19.     Defendants and their affiliated companies represented to their customers who had fixed-variable rate cards that their interest rates would be tied to the Prime Rate and that the annual percentage rates associated with their accounts would not be increased unless the Prime Rate increased, or unless they defaulted or otherwise established a poor account history with Defendants or their affiliates. Such understanding was reflected in Defendants' form contracts.

20.     Defendants and their affiliated companies represented to their customers with fixed-rate cards, including Plaintiffs, that their interest rates would remain fixed and constant, regardless of changes in the interest rate environment, unless they defaulted or otherwise established a poor account history with Defendants or their affiliated companies. Such understanding was reflected in Defendants' form contracts.

21.     American Express' arbitrary decision to increase annual percentage rates on existing fixed-variable accounts or convert existing fixed-rate accounts to fixed-variable rate accounts, despite *decreases* in broader market interest rate measures, including the Prime Rate,

demonstrates that Defendants and their affiliated companies have failed to adhere to the terms of their contracts. Such contracts were prepared by American Express and, therefore, any ambiguity must be resolved in favor of Plaintiffs and Currently Unnamed Plaintiffs. Further, American Express is required to act in good faith and deal fairly with its small business customers.

22.     These rate increases were made not to save Defendants and their affiliated companies in a volatile business environment, but were an opportunistic attempt to take advantage of a financial panic that had put the world economy on the edge of a precipice. In effect, Defendants and their affiliated companies were price-gouging their small business customers by increasing interest rates when customers were most vulnerable.

23.     Throughout the economic downturn, and rebound, American Express has been profitable. While profitability varies from quarter to quarter, Defendants and their affiliated companies have not had a single quarter in which they were not immensely profitable. For example, during the Fall of 2008 and Winter of 2009, when the credit markets collapsed, the stock market plummeted to generational lows, and the world stood in fear of a second Great Depression, Defendants and their affiliated companies reported hundreds of millions of dollars in profits each quarter. From the beginning of the third fiscal quarter of 2008 through the end of the second fiscal quarter of 2009 (July 2008 to July 2009), American Express reported $1.632 billion in profits.

24.     Despite continuing profitability, American Express Company and American Express Travel Related Services, Inc. converted to bank holding companies on November 10, 2008 in order to receive taxpayer funds under the Troubled Asset Relief Program (TARP). After the conversion, these holding companies were awarded $3.39 billion in taxpayer funds.

25.     Based on American Express' continuing profitability and its receipt of taxpayer guaranteed funding, it was in no danger of collapse nor of even suffering so much as a single, unprofitable quarter. These facts further show that the conduct of Defendants and their affiliated companies at issue in this suit had no good faith basis and was motivated solely by greed and a belief that Defendants could get away with unconscionable and improper behavior at the expense of their small business clients.

### FACTUAL ALLEGATIONS SPECIFIC TO MS. ZEEVI-FARRINGTON AND MANHATTAN STEAMBOAT

26.     Manhattan Steamboat has maintained an American Express branded Blue for Business credit card account from June 2004 to present. The card, when originally opened, had a credit limit of $26,000 and a fixed interest rate of 7.99 percent. Throughout the life of the account, Manhattan Steamboat has kept the account in good standing and honored all terms and conditions.

27.     Ms. Zeevi-Farrington, President and Co-founder of Manhattan Steamboat, has at all times provided a personal guarantee for the account.

28.     Defendants and their affiliated companies unilaterally increased Manhattan Steamboat's fixed interest rate from 7.99 percent to 9.99 percent for billing periods beginning on or after March 3, 2009.

29.     Barely a year later, Defendants and their affiliated companies converted Manhattan Steamboat's account from a fixed rate account to a fixed-variable rate equivalent to the Prime Rate plus 9.99 percent. Such changes took effect for billing periods beginning on or after August 1, 2010. This resulted in an effective rate of 13.24 percent.

30.     Each increase in the interest rate charged to Manhattan Steamboat, and for which Ms. Zeevi-Farrington was personally liable, resulted in a substantial increase in required monthly

payments and monthly finance charges. Shockingly, American Express even *applied the new higher interest rates to balances that had been accrued previously*.

31.     In addition to changes in interest rates, Defendants and their affiliated companies repeatedly decreased Manhattan Steamboat's credit limit. On or about March 2009, Defendants unilaterally decreased the credit limit on the account from $50,000 to $38,200. In a letter dated April 25, 2010, Defendants notified Ms. Zeevi-Farrington that the credit limit for Manhattan Steamboat's account had been decreased again, this time to $30,900. In each instance, the decreased credit limit was barely above the outstanding balance on the account.

32.     These repetitive decreases in Manhattan Steamboat's credit line were reported on Ms. Zeevi-Farrington's personal credit report. With each reported decrease in Manhattan Steamboat's credit limit, Ms. Zeevi-Farrington's credit utilization ratio increased dramatically, thereby decreasing her personal credit score and personal apparent creditworthiness, increasing the cost of borrowing from both American Express and other lenders.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action for themselves and on behalf of all American Express small business credit card holders who incurred increases to the annual percentage rates associated with their credit cards in violation of their agreements with Defendants.

34.     The Class of persons or entities described above is so numerous that joinder of all members by name in one action is impracticable. All injuries sustained by any member of the Class arise out of the conduct of American Express as described herein. There will be no doubt that American Express acted in a manner equally applicable to a Class of at least hundreds of thousands of credit card customers. The company changed its practices starting in 2008 to the detriment of the vast majority of its small business customers.

35.     The widespread application of the changes of Defendants and their affiliated companies is illustrated by a Cease and Desist Order that the company entered with the Federal Deposit Insurance Corporation ("FDIC") on June 30, 2009. In that instance, the FDIC found that American Express engaged in an unfair business practice by sending customers "convenience checks" along with a statement showing their available credit limit and then the company unilaterally cut the credit limit, thereby inducing customers to suffer penalties and fees from American Express and others. After the FDIC made its determination, Defendants agreed to compensate the affected customers directly by issuing reimbursements that were expected to exceed $3,000,000 and paying a civil penalty in the amount of $250,000. A similar direct refund requirement would certainly be appropriate as a component of the final resolution of this matter.

36.     Important questions of law and fact exist which are common to the entire Class and predominate over any questions that may affect individual Class Members in that Defendants and their affiliated companies have acted on grounds generally applicable to the entire Class. It will be shown that American Express instituted unilateral increases to the interest rates associated with Plaintiffs' credit card accounts and those of millions of American Express small business customers identically situated to the named Plaintiffs.

37.     All questions as to the actions attributable to Defendants and their affiliated companies herein are similarly common. A determination of liability for such conduct will also be applicable to all members of the Class.

38.     The claims of the Class representatives – Dorit Zeevi-Farrington and Manhattan Steamboat, LLC – are typical of the claims of the Class in that they suffered damages as a result of American Express' improper practices.

39.     Plaintiffs will fully and adequately represent and protect the interests of the entire

Class because of the common injuries and interests of the Class Members and the uniform conduct of Defendants and their affiliated companies as to all Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation. Plaintiffs have no interests that are contrary to, or in conflict with, those of the Class they seek to represent.

40.     A class action is superior to all other available methods for fair and efficient adjudication of this controversy. There is no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

41.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants under the laws alleged herein.

## ARBITRATION

42.     Beginning in 1998, American Express conspired with its competitors, including Capital One, Bank of America, MBNA, Discover, Citibank, and others, to adopt arbitration clauses in all consumer and small business credit card agreements. The facts of the illegal effort are well known. Litigation regarding the matter has been pending in the Southern District of New York for nearly a decade. *See Ross v. American Express, et al.*, Case No. 1:04-cv-05723-WHP. Most credit card companies settled the litigation and agreed not to enforce the improper arbitration clauses but American Express has thus far refused to cease enforcement of the clauses. A recent trial revealed extensive factual findings in support of the plaintiffs' effort to preclude further enforcement of American Express' arbitration clause. *See* Dkt. No. 355 in Case No. 1:04-cv-05723-WHP (proposed findings and conclusions post-trial). A decision is expected

soon which could preclude American Express from enforcing the unlawful arbitration clause. Although there is no reason to re-litigate these issues in this case, this history is mentioned in an abundance of caution should Defendants later attempt to enforce arbitration in this case.

43.     In order to argue that it will still be able to enforce arbitration regardless of the result in the *Ross* litigation, American Express recently purported to revise its arbitration provision for its small business customers. In doing so, it offered each customer the ability to opt out of the arbitration clause. Plaintiffs timely submitted their opt-out notices. Thus, for at least two independent reasons, this case is not subject to arbitration.

## FIRST CLAIM FOR CLASS RELIEF

## BREACH OF CONTRACT – UNILATERAL INCREASE OF FIXED INTEREST RATES

44.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-43 above as if set forth verbatim herein.

45.     Manhattan Steamboat, Ms. Zeevi-Farrington, and numerous others like them, entered into an agreement with American Express where the interest rate charged for purchases was fixed. In these agreements, the risks and rewards of both parties from increasing and decreasing interest rate environments were eliminated in return for the certainty and stability of a predictable cash-flow provided by a fixed interest rate.

46.     American Express unilaterally decided to increase the supposedly fixed interest rate to a higher fixed interest rate. In the specific case of Manhattan Steamboat and Ms. Zeevi-Farrington, the increase was from 7.99 percent to 9.99 percent. In the case of the numerous unnamed class members, the rate increase may be superficially different, but the conduct at issue is still the same.

47.     By raising a fixed interest rate, American Express breached the contract. A fixed

interest rate is, by definition, one that does not change. While Manhattan Steamboat thought it was agreeing to a fixed rate of 7.99 percent, and Ms. Zeevi-Farrington thought she was agreeing to guarantee a rate of 7.99 percent, American Express was now charging Manhattan Steamboat a rate of 9.99 percent and forcing Ms. Zeevi-Farrington to personally guarantee a rate of 9.99 percent.

48.     Based upon the Defendants' and their affiliated companies' breach of the credit card agreement, the Class Members should be awarded damages and all other relief necessary to return them to their proper position as if American Express had honored its agreements.

## SECOND CLAIM FOR CLASS RELIEF

### BREACH OF CONTRACT – CONVERSION OF FIXED RATE ACCOUNTS TO FIXED-VARIABLE RATE ACCOUNTS AND INCREASES TO FIXED PORTION OF TOTAL INTEREST RATE

49.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-43 above as if set forth verbatim herein.

50.     Manhattan Steamboat, Ms. Zeevi-Farrington and numerous others like them, entered into an agreement with American Express where the interest rate charged for purchases was fixed. In these agreements, the risks and rewards of both parties from increasing and decreasing interest rate environments were eliminated in return for the certainty and stability provided by a fixed interest rate. While Manhattan Steamboat and Ms. Zeevi-Farrington may not have received the lowest rate possible, and American Express may not have received the highest rate possible, both enjoyed the benefit of a fixed interest rate. In Manhattan Steamboat's and Ms. Zeevi-Farrington's case, they enjoyed the certainty and predictability of knowing how much interest was owed and could accurately manage business cash flow accordingly. In American Express' case, Defendant could predict the amount of finance charges it would receive from

Manhattan Steamboat or Ms. Zeevi-Farrington.

51.    When American Express converted Manhattan Steamboat's account to a fixed-variable rate, it unilaterally changed the essential and material terms of the contract after the fact. Further, increases to the fixed portion of the calculation of the total interest rate (e.g., from 2.99% to 7.99%) wholly violated the concept of tying interest rates to market rates, such as the Prime Rate.

52.    The change from a fixed interest rate to a fixed-variable interest rate shifted all of the risk from American Express to Manhattan Steamboat and Ms. Zeevi-Farrington. With the Prime Rate at an historic low (3.25 percent since 2008), Manhattan Steamboat's rate under the new regime was not likely to ever fall. In contrast, there is no limit to the amount that the Prime Rate could increase. In short, Manhattan Steamboat can only marginally benefit from any further decrease in the Prime Rate, but is exposed to the high risk that the Prime Rate will climb from its current historic lows. Obviously, the variable rate in excess of the Prime Rate which was used to calculate the total interest charges, was also arbitrarily set by American Express in violation of the parties' contract. Ms. Zeevi-Farrington is now the personal guarantor to a loan with different terms and conditions and substantially increased risks than she originally agreed to personally guarantee. In contrast, American Express has imposed a new deal, after the fact, that exposes it to almost no interest rate risk at all.

53.    Based upon the Defendants' and their affiliated companies' breach of the credit card agreement, the Class Members should be awarded damages and all other relief necessary to return them to their proper position as if American Express had honored their agreements.

# THIRD CLAIM FOR CLASS RELIEF

## BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING

54.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-43 above as if set forth verbatim herein.

55.     The current version of the credit card agreement provides:

> We may change the benefits and services: We have the right to add, modify, or delete any benefit, service, or feature of your Account at our discretion.

> We may change the Agreement: We may change the terms of, or add new terms to, this Agreement. We may apply any changed or new terms to any existing and future balances on your Account, subject to applicable law.

56.     Upon information and belief, all credit card agreements across all credit card account types contain this term, or a similarly worded term with the same material effect.

57.     Under the law of every state, the duty of good faith and fair dealing – or an equivalent doctrine by another name – is an element of every contract. Every contract imposes upon each party a duty of good faith and fair dealing in its performance. Good faith in contracting is the obligation to preserve the spirit of the bargain rather than merely the letter, the adherence to substance rather than form. Evasion of the spirit of the bargain and abuse of a power to specify terms have been judicially recognized as breaches of good faith in the performance of contracts.

58.     Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his or her conduct to be justified. But the obligation goes further; a lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of the varieties of breaches of good faith cannot be offered

herein, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

59.     Where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such a determination is implied. American Express has, on the one hand, told customers that their interest rates will either be tied to the Prime Rate or be fixed at a set rate and, on the other hand, purported to reserve for itself a unilateral ability to choose whether to increase customers' annual percentage rates or change the method of calculating customers' rates, and to also unilaterally determine the size of such rates increases. Because Defendants and their affiliated companies increased the marginal annual percentage rates unilaterally, American Express had an obligation to act in good faith. Defendants and their affiliated companies have breached this obligation by unilaterally imposing increases in marginal percentage rates and by converting fixed rate accounts to fixed-variable rate accounts – thereby wholly divorcing customers' interest rates from any real relationship with the Prime Rate or the terms of the original account agreement.

60.     In breach of their duties of good faith and fair dealing, Defendants and their affiliated companies abused the powers reserved for American Express by offering the Plaintiffs and the proposed Class Members a devil's bargain. Plaintiffs could choose between paying increased interest on all past, present, and future purchases made with the Defendants' credit cards, or they could choose – in the tightest credit market in decades – to procure funds to pay off and close the account. Even this unlikely option was hazardous, because those who closed their accounts suffered a decreased credit score with the accompanying increase in interest rates

15

and credit costs with all other lenders.

61.     Manhattan Steamboat has been forced to pay finance charges at a rate above that which was agreed to. Further, Ms. Zeevi-Farrington has been saddled with personal liability for higher interest rates than agreed-upon and for a fixed-variable rate account rather than the contracted-for fixed rate.

62.     Plaintiffs seek a judicial declaration determining that the higher rates imposed by American Express, and the conversion of fixed rate accounts to fixed-variable rates, are not consonant with the duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Defendants' and their affiliated companies' breach of contract through their failure to act in accordance with good faith and fair dealing.

## FOURTH CLAIM FOR CLASS RELIEF

### UNCONSCIONABILITY

63.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-43 above as if set forth verbatim herein.

64.     A current version of American Express' credit card agreement provides:

> We may change the benefits and services: We have the right to add, modify, or delete any benefit, service, or feature of your Account at our discretion.

> We may change the Agreement: We may change the terms of, or add new terms to, this Agreement. We may apply any changed or new terms to any existing and future balances on your Account, subject to applicable law.

65.     This is only one of several grossly one-sided contractual provisions that Defendants have inserted into their form credit card agreement. Such provisions meet the standard for unconscionability and therefore cannot be enforced by Defendants or their affiliated companies.

66.     Considering the great disparity in the relative bargaining power between Defendants and Ms. Zeevi-Farrington, on behalf of their respective companies, the inconspicuousness and incomprehensibility of the contract language, the oppressiveness of the terms, and the absence of a meaningful choice, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and therefore unenforceable as a matter of law. Defendants and their affiliated companies claim that they can increase any fee or interest rate by whatever amount they choose at any time. Inherent in this belief is Defendants' position that they can have complete control of their customers' financial lives. Obviously, this result cannot be allowed under the law. As such, if concepts of breach of contract and breaches of good faith and fair dealing do not constrain Defendants' conduct under their "change in terms" provision – as presumably Defendants will argue in this litigation – then this provision must be found unconscionable. Several other provisions of the credit card agreement are similarly unconscionable and unenforceable.

67.     For example, through their "change in terms" provision, Defendants and their affiliated companies have essentially reserved for themselves the ability to bankrupt any customer at any time by changing the interest rates and payment terms after the fact on purchases already made to levels so high as to make the required payments impossible to pay. Business owners, such as Ms. Zeevi-Farrington, make their purchases under the assumption that they will be charged the interest rate currently in effect and agreed upon. After the purchases are made, American Express changes the interest rate on the account and applies the new, higher interest rate to the already existing balance. The result is that business owners are charged hundreds of dollars per month more in interest than they had budgeted for or were aware they would be

charged when their purchases were made. The result is the same whether or not a business owner is on a fixed rate card or a "fixed-variable" rate card. Under this unconscionable term, a business owner's cash flow becomes impossible to manage because finance charges are impossible to predict with any certainty.

68. Here, Ms. Zeevi-Farrington, and those similarly situated are not bankers. American Express does not negotiate the terms of its credit card agreements with any customers, but instead uses contracts of adhesion containing boilerplate language memorializing the contract. Ms. Zeevi-Farrington, like most customers, was not in a position to bargain for more favorable contract terms, nor was she able to experience the results of American Express' practices before obtaining an American Express credit card. With regard to the "surprise factor," Ms. Zeevi-Farrington, and those similarly situated were not made aware of Defendants' practices at the time the contract was entered into.

69. Plaintiffs request an inquiry into the setting, purpose, and effect of these terms, including the basis and justification for these unilateral increases in annual percentage rates. The credit card industry should not be immune from scrutiny. Combined with the absence of meaningful alternatives, an inability to negotiate contract terms, and Defendants' deceptive practices, the Court should strike down these practices as unconscionable.

70. Defendants and their affiliated companies have structured totally one-sided transactions. The absence of equality of bargaining power, open negotiation, full disclosure, and a contract which fairly sets out the rights and duties of each party demonstrates that the transaction lacks those checks and balances which would inhibit, for example, the unilateral changing of interest rates. Each improper rate increase imposed by Defendants and their affiliates should be rescinded and Plaintiffs and those similarly situated should be refunded the

excess interest paid to Defendants. Plaintiffs and the proposed Class Members should likewise be made whole as if any and all other unconscionable provisions of the credit card agreement had not been enforced to their detriment.

## FIFTH CLAIM FOR CLASS RELIEF

### UNJUST ENRICHMENT

71.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-43 above as if set forth verbatim herein.

72.     This count is being pled in the alternative to Plaintiffs' counts for breach of contract and breach of the duty of good faith and fair dealing. Plaintiffs concede that, so long as their contract-based claims are found meritorious, they will not be able to pursue this claim for unjust enrichment.

73.     By means of Defendants' improper conduct as alleged herein, Defendants and their affiliated companies knowingly imposed interest rate increases on Plaintiffs and those similarly situated that were unfair, unconscionable, and oppressive.

74.     Defendants and their affiliated companies knowingly received and retained wrongful benefits and funds from Plaintiffs and those similarly situated. In so doing, Defendants and their affiliated companies acted with conscious disregard for the rights of Plaintiffs and members of the proposed Class.

75.     As a result of Defendants' unlawful conduct as alleged herein, they have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and those similarly situated.

76.     The unjust enrichment of Defendants and their affiliated companies is traceable to, and resulted directly and proximately from, the conduct alleged herein.

77.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendants and their affiliated companies to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of improper interest rate increases on Plaintiffs and those similarly situated in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

78.     The financial benefits derived by Defendants and their affiliated companies rightfully belong to Plaintiffs and those similarly situated. American Express should be compelled to disgorge in a common fund for the benefit of Plaintiffs and those similarly situated, all unlawful or inequitable proceeds received by them.

WHEREFORE, Plaintiffs Dorit Zeevi-Farrington and Manhattan Steamboat Company, LLC and the numerous Currently Unnamed Plaintiffs pray:

(1)     For certification of this matter as a class action lawsuit to proceed on behalf of the Class of all Currently Unnamed Plaintiffs as defined herein after suitable initial discovery has been completed;

(2)     That Plaintiffs Dorit Zeevi-Farrington and Manhattan Steamboat Company, LLC be accepted as representatives of the Class and that their attorneys be designated counsel for the Class;

(3)     For restitution;

(4)     For an award of such damages as are authorized by law;

(5)     For an award of all reasonable costs and attorneys' fees incurred by Plaintiffs;

(6)     For trial by jury of all matters; and

(7)    For such other and further relief as the Court may deem just and equitable.

Dated: August 8, 2013

SQUITIERI & FEARON, LLP

By: _____
        Stephen J. Fearon, Jr.
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492 tel.
(212) 421-6553 fax

WEBB, KLASE & LEMOND, LLC
E. Adam Webb
Matthew C. Klase
G. Franklin Lemond, Jr.
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773 tel.
(770) 217-9950 fax

Attorneys for Plaintiffs